Filed 12/16/25  Corman v. Corman CA2/2

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION TWO

|  |  |
|---|---|
| BRIAN WILLIAM CORMAN et al.,<br><br>    Plaintiffs and Appellants,<br><br>    v.<br><br>JULIE CORMAN, Individually and as Special Administrator, etc., et al.,<br><br>    Defendants and Respondents. | B317915<br><br>(Los Angeles County Super. Ct. Nos. BC681310, SP007923 & 17STPB07675) |

APPEAL from a judgment and orders of the Superior Court of Los Angeles County, Clifford Klein, David J. Cowan, and Reva Goetz (Ret.), Judges.  Affirmed.

Complex Appellate Litigation Group, Rex S. Heinke and Jessica M. Weisel for Plaintiffs and Appellants.

Saul Ewing, Geraldine A. Wyle, Jeryll S. Cohen, Thomas C. Aikin and Joi L. Morris for Defendant and Respondent Julie Corman, Individually and as Special Administrator, etc.

Lavely & Singer, Martin D. Singer and Allison S. Hart for Defendants and Respondents Catherine A. Corman and Mary Corman.

Eisner and Zachary Elsea for Defendant and Respondent New Horizons Picture Corporation.

\* \* \* \* \* \*

These consolidated appeals concern enforcement of a written settlement agreement intended to "put a final end to all litigation" between family members who have been litigating against each other for more than 20 years. Appellants challenge orders reducing the settlement agreement to an enforceable judgment, claiming the trial court exceeded its authority by imposing terms to which they did not agree.

We hold that the trial court was authorized by the terms of the settlement agreement and by Code of Civil Procedure section 664.6 to enforce the parties' settlement by granting respondents' motions to enter judgment. We therefore affirm the trial court's orders and the judgment entered thereon.

## BACKGROUND

**The parties**

Roger William Corman[1] was a successful and prolific filmmaker. His wife and business partner Julie Corman was a

---

[1] Because the parties share the same surname, we refer to them by their first names. Roger William Corman and Roger M.

2

film producer. Roger W. and Julie (collectively, Parents)[2] have four adult children:  Sons Brian William Corman and Roger M. Corman (collectively, Sons) and daughters Catherine Corman and Mary Corman (collectively, Daughters).  New Horizons Picture Corporation (New Horizons) is a California corporation owned by the Parents, through which the Parents distributed Roger W.'s films.

The Sons are the appellants in these appeals.  The Parents, Daughters, and New Horizons are respondents.

**The trusts**

The Parents established and funded seven irrevocable trusts for the benefit of the Sons and Daughters: the Pacific Trust, the Tessa Trust, the MG Trust, and four Qualified Personal Residence Trusts (QPRTS).  The Parents were the original trustees of all the trusts.

*Pacific Trust*

The Goldman Sachs Trust Company, N.A. (Goldman Sachs), is the current trustee and successor trustee of the Pacific Trust, following Roger W.'s and Julie's resignation from those positions in 2014.  The Sons' and Daughters' respective 25 percent interests in the Pacific Trust are held in four separate subtrusts.

The Pacific Trust assets relevant to this dispute are San Onofre Properties LLC and La Mesa Pictures LLC.  San Onofre Properties LLC owns a commercial building located on 2nd Street

---

Corman also share the same first name, so we distinguish between them by their middle initials.

[2]     Roger W. died in 2024.  Julie is the special administrator of Roger W.'s estate.

in Santa Monica (2nd Street Property). La Mesa Pictures LLC owns the intellectual property rights to approximately 150 motion picture titles made by Roger W. (Film Library). Goldman Sachs, as trustee of each of the Sons' and Daughters' respective subtrusts, is the sole member of La Mesa Pictures LLC.

Catherine and Brian are the managers of San Onofre Properties LLC. The Daughters are the managers of La Mesa Pictures LLC.

### Tessa Trust

The Tessa Trust assets consist of motion pictures produced by Julie and other monetary and nonmonetary assets. The Sons and Daughters have equal 25 percent interests in the Tessa Trust.

### MG Trust

The MG Trust's principal asset is the Sons' and Daughters' respective 25 percent interests in a 99 percent limited partnership known as the Corman Family Investment Partnership (CFIP). The Parents own a one percent general partnership interest in the CFIP. The CFIP's main asset is a commercial office building located on San Vicente Boulevard in Los Angeles (San Vicente Property) that it leases to New Horizons.

### QPRTS

In the early 1980's, the Parents built a home located at 2501 La Mesa Drive in Santa Monica (Residence), in which the family lived and in which Julie continues to reside. In 2002, the Parents established four QPRTS for the benefit of the Sons and Daughters and transferred ownership of the Residence to the QPRTS. The Sons and Catherine are cotrustees of the QPRTS and Mary is a successor trustee.

4

**Black Scorpion loan**

The Pacific Trust owns the intellectual property rights to two movies named Black Scorpion. A television series based on the movies was produced in the 1990's at a cost of $13 million and subsequently sold for $1 million, resulting in a $12 million loss. To shift that loss from the Pacific Trust to the Parents in a manner that would minimize tax consequences to the Sons and Daughters, the Parents structured a transaction to purchase the television series rights from the Pacific Trust, financed by promissory notes. The Parents' intent was that repayment of accrued interest on the notes would not be considered a taxable inheritance by the Sons and Daughters.

To effect the Parents' intent, the Black Scorpion Company, a general partnership in which the Parents were the general partners, purchased the television series from the Pacific Trust for $13 million. The purchase price was paid by six promissory notes payable to the Pacific Trust, the MG Trust, and the Sons and Daughters. The notes were secured by a first priority security interest and lien against shares of New Horizons preferred stock. Each of the notes originally provided that principal and interest would become payable on the 10th anniversary of the note. The Black Scorpion notes were consolidated and modified in 2002.

The New Horizons preferred stock was sold on January 6, 2005. After the New Horizons stock was sold, the Black Scorpion notes were again modified in 2006 to extend the due date for all principal and interest to the date of death of the survivor of the Parents.

**Prior litigation**

*2009–2013 litigation*

In 2009, the Sons filed probate court petitions seeking to remove or suspend the Parents as trustees of the Pacific Trust, Tessa Trust, and MG Trust. The petitions alleged the Parents breached fiduciary duties by refusing to provide the Sons with accountings, failing to make required distributions, borrowing trust funds at inadequate interest rates, and depleting trust assets. A guardian ad litem (GAL), representing the interests of unborn and unascertained beneficiaries of the trusts, filed a brief joining in the Sons' allegations.

The matters were tried in 2013, along with a new petition the Sons filed seeking a declaration that the Parents' interest in Pasig, Ltd., a British Virgin Islands (BVI) entity, was held as trustee of the Pacific and Tessa Trusts. The trial court dismissed the Pasig petition as moot based on a 2013 judgment by a BVI court ruling that Roger W. was the true beneficial owner of Pasig and its assets.

As part of their objections to the Parents' accountings, the Sons asserted claims regarding the Black Scorpion loan. They claimed that the 2005 sale of New Horizons preferred stock breached the terms of the Black Scorpion notes, making them immediately due and payable.

The trial court (Hon. Reva Goetz) found that "the Black Scorpion Loans and their extensions are permitted by the Pacific Trust" and rejected the Sons' claims that the Parents breached the terms of the loan by selling the New Horizons stock. The court denied the Sons' request for an order that the loans were immediately due and payable.

6

The trial court further found that the Sons failed to introduce any evidence of malfeasance or improper accounting and that they had contested the trust accountings without reasonable cause and in bad faith. The trial court found an ambiguity in the distribution provisions of the MG Trust, that the Parents intended the beneficiaries to receive shares of the MG Trust principal only after the death of both Parents, and that the MG Trust should be reformed to reflect that intent. Judgment was entered on December 3, 2013 (the 2013 judgment).

The Sons appealed the 2013 judgment, challenging the trial court's ruling that the Parents did not breach their fiduciary duties and dismissal of the petition regarding Pasig, Ltd. They did not challenge the trial court's denial of their claim that the Black Scorpion loan was due immediately. The Court of Appeal reversed the 2013 judgment as to three issues: (1) the appellate court found that Roger W. breached his duty of loyalty by withdrawing $1.3 million from the Pacific Trust and remanded the matter for the trial court to determine whether Roger W.'s liability for doing so should be excused under Probate Code section 16440;[3] (2) the appellate court reversed the trial court's ruling reforming the MG Trust's provisions; and (3) the appellate court reversed the attorney fees award against the Sons. Roger W.'s potential liability regarding the $1.3 million withdrawal was rendered moot when he returned those funds to the Pacific Trust.

---

[3]     Probate Code section 16440, subdivision (b) gives the court discretion to excuse a trustee who has committed a breach of trust "[i]f the trustee has acted reasonably and in good faith under the circumstances as known to the trustee," and it would be equitable to do so.

7

The Parents entered into a settlement agreement with the GAL, which the trial court approved as a court order (the 2014 Order). Pursuant to the 2014 Order, the Parents resigned as trustees of the Pacific Trust but retained all nonfiduciary powers, including the power to remove and replace any corporate fiduciary appointed to act as a trustee or special trustee of the Pacific Trust.

To fill the vacancy created by the Parents' resignation as trustees of the Pacific Trust, Catherine and Mary petitioned the trial court for an order appointing a successor trustee. The court granted the petition and on June 25, 2014, entered an order appointing Goldman Sachs as successor trustee of the Pacific Trust. The court ordered Goldman Sachs to create two separate limited liability companies to hold the Pacific Trust assets. The two limited liability companies created were San Onofre Properties LLC and La Mesa Pictures LLC.

In February 2015, the parties submitted a stipulation seeking an order approving draft operating agreements for San Onofre Properties LLC and La Mesa Pictures LLC and requesting that Goldman Sachs be "permanently released from having to administer, manage, oversee, or exercise any discretion over [San Onofre Properties LLC and La Mesa Pictures LLC] or the assets to be owned by [San Onofre Properties LLC and La Mesa Pictures LLC], except as such duties are expressly identified in the LLC Operating Agreements."

The La Mesa Pictures LLC members are the four subtrusts held within the Pacific Trust. At all relevant times, Goldman Sachs has been the trustee for each subtrust.

### QPRTS litigation

In August 2017, the Sons filed a petition in case No. 17STPB07675 concerning the QPRTS, seeking, among other things, the ability to evict the Parents from the Residence. When the Daughters opposed the litigation, the Sons filed a petition to remove Catherine as trustee and Mary as successor trustee of the QPRTS.

### CFIP litigation

In October 2017, the Sons filed a derivative action on behalf of the CFIP against the Parents and New Horizons in case No. BC681310, alleging breach of contract, breach of fiduciary duty, and waste of partnership assets. At issue in this action was the fair market rent that New Horizons should pay for its lease of the San Vicente Property.

### Film Library litigation

In December 2017, Brian filed a petition in case No. SP007923 seeking to remove the Daughters as comanagers of La Mesa Pictures LLC and prohibiting Goldman Sachs from taking any action concerning La Mesa Pictures LLC or the Film Library. He alleged the Daughters were demanding that Goldman Sachs transfer certain rights from the Pacific Trust to La Mesa Pictures LLC in order to sell the Film Library to a third party without the Sons' consent.

On August 10, 2018, the trial court entered an order granting in part and denying in part Brian's petition. The court ordered Goldman Sachs to assign the intellectual property owned by the Pacific Trust to La Mesa Pictures LLC. The order required the unanimous consent of the Sons and Daughters to sell the Film Library and required the Daughters to provide written notice to the Sons before exploiting the Film Library.

In April 2018, the Sons filed a petition in case No. SP007923 alleging the Parents and New Horizons had improperly sold certain films the Sons claimed belonged to the Pacific Trust.

**Preliminary deal point memorandum (PDPM)**

Trial of the CFIP litigation commenced on February 7, 2020. The same day, the parties stipulated to suspend the trial and to attempt to negotiate a global settlement. The settlement discussions culminated in a four-page PDPM signed by the parties and that is the subject of this appeal.

The PDPM was entered on the record on February 10, 2020. It states the parties' intent to resolve all pending litigation among the family members and their related entities: "The parties intend by this agreement to put a final end to all litigation between and among the family members and related entities." The PDPM further states the parties' intent to completely separate their interests in the various trusts: "Everyone is completely separated – After the close of escrow . . . Sons will have no further interest, and shall disclaim, disavow, forever, irrevocably all interest (and that of their issue) in Parents' estate, Daughters' estates and Daughters' Pacific Trust, the Tessa Trust, the MG Trust, and the QPRTs, except for documents implementing the terms of this agreement, per Court order." The Daughters similarly disclaimed all interest in the Sons' estates and the Sons' Pacific Trust interests.

The PDPM states that it "is a binding preliminary deal point memorandum, enforceable under Section 664.6 of the Code of Civil Procedure" but contemplates a more detailed long-form agreement: "Due to the complexity of the separation of interests, a long-form agreement, which would include detailed agreement

10

on the structure of the numerous transactions contemplated, will be necessary." To that end, the parties agreed that Los Angeles Superior Court Judge David Cowan would "participate as a settlement officer in the negotiation of the final long-form agreement, and he shall have discretion to assist the Parties in reaching the final terms, as necessary."

The PDPM is to be implemented in two phases. Phase 1 involves separating the parties' interests in shared assets and terminating pending litigation. Phase 2 concerns disposition of the Film Library, distribution of film rights held in the Tessa Trust, and resolution of issues pertaining to the Black Scorpion loan.

Terms of the PDPM relevant to this appeal are summarized below.

### *Residence*

The Sons will transfer their interests in the Residence to the Daughters and will receive 50 percent of the fair market value of the Residence and 50 percent of the associated bank account balance. The Sons agree to resign as cotrustees of the QPRTS and to modify the QPRTS to eliminate the Sons' interest, "bearing in mind that retaining the property tax basis is a material term."[4] The Parents have the right to remain in the Residence for the rest of their respective lives.

### *2nd Street Property*

The Daughters will transfer their interests in the 2nd Street Property and San Onofre Properties LLC to the Sons and will receive 50 percent of the fair market value of the 2nd Street

---

[4] The Parents and the Daughters opposed any sale that would increase the property tax basis of the Residence.

11

Property and 50 percent of the current bank balance of San Onofre Properties LLC.

### MG Trust/CFIP

The Sons will transfer their interests in the MG Trust/CFIP either to the Parents or the Daughters, at the Daughters' election. The Sons will receive 50 percent of the fair market value of the San Vicente Property and 50 percent of the non-real estate assets of the MG Trust/CFIP.

### Pacific Trust

The Sons' and Daughters' respective subtrusts will be modified to separate their respective interests and to divide equally any jointly owned assets. "This is a material term of the agreement to Brian and Roger M."

### La Mesa Pictures LLC

Disposition of the La Mesa Pictures LLC rights will be dealt with in Phase 2.

### Tessa Trust

Fifty percent of all assets will be distributed to the Sons, in kind or in cash, to be determined in Phase 2. Implementation of the distribution of the film rights held in the Tessa Trust and issues relating to the Black Scorpion loan will be addressed in Phase 2.

### Miscellaneous provisions

Other relevant provisions of the PDPM are as follows:

"Nothing herein is meant to change or supersede the . . . Order Approving Settlement Agreement, dated May 13, 2014, issued in Case No. SP007923" or "obligations relating to the Black Scorpion loan, which will be dealt with in Phase 2. Judge Cowan shall have the authority to modify the May 13, 2014 order in connection with the anticipated petitions to modify the Pacific

12

Trust subtrusts and implementation of this agreement and to deal with the distribution and issues relating to the Black Scorpion loan in Phase 2, as he deems necessary."

"All of the transactions above are to be completed in [a] tax-sensitive manner to all parties, including with regard to gift taxes and estate taxes, and allowing for the preservation of property tax rates (if possible). The facilitation of a 1031 exchange, to the extent reasonably practical, is a material term of this agreement. Maintaining the tax basis of all real property to the extent reasonably practical is a material term of this agreement. All tax-related transactions shall be concluded concurrently with the close of escrow."

"Regarding cash and cash equivalents in CFIP, Tessa Trust, MG Trust, 2nd Street, and the QPRTs—Statements for accounts held by each entity going back 6 months from February 7, 2020. No further expenses/distributions to be made other than ordinary business expenses (property maintenance, insurance, property taxes, income taxes, utilities, repairs, etc., and costs of implementing settlement as agreed by all parties— e.g., appraisal costs, filing fees for Petitions to Modify, etc.) from February 7, 2020 through the date of closing. Customary reserves shall be retained in each trust and/or entity account for necessary expenses, including taxes and accounting fees. There will be a true-up for the period from the date of settlement through the date of closing."

"The long form agreement shall include mutual and general releases for all claims including without limitation with respect to elder abuse, breaches of fiduciary duty of all kinds, financial abuses, accountings or transactions for any entity/trust prior to the date of settlement for all parties in all capacities. Releases

from Pacific Trust and beneficiaries of all irrevocable trusts, New Horizons, Roger & Julie, individually and in all other capacities, as well as all of Roger's and Julie's other entities as well as entities of Roger M., Brian, Catherine and/or Mary. These releases shall apply to any claims that Roger M. or Brian have against Catherine or Mary concerning any gifts or transfer of assets by Roger W. and Julie, in the past. Any releases that extend to other family members, who are not parties to this agreement, shall be dealt with in Phase 2. This release shall not apply to issues of estate, gift, and income taxes, which shall be dealt with in Phase 2."

"Other standard boiler plate provisions, including Civil Code § 1542 and cooperation clauses."

**Proceedings to enforce the PDPM**

In August 2020, the Sons successfully petitioned to immediately modify their individual Pacific Trust subtrusts, giving them the power to remove and appoint the trustee of their subtrusts.

### *Real property and San Onofre Properties LLC*

In February 2020, the parties submitted proposed appraisers to determine the fair market value of the real estate assets held by the various trusts. The trial court issued a minute order selecting the Sons' proposed appraisers. The selected appraisers determined fair market values for the real property assets as of two dates—February 7, 2020 (the date the PDPM was signed), and the present value as of the date of the appraisers' engagement—June 22, 2020.

The Sons disagreed with the appraisals for both the Residence and the San Vicente Property and argued that February 7, 2020, should be the date used for the appraisals. At

14

an August 20, 2020 hearing, the trial court ruled that the February 7, 2020 appraisal dates would be used.  The parties stipulated at the August 20, 2020 hearing that there would be no further evidentiary hearings on the appraisal values.  The trial court subsequently issued a November 5, 2020 written order adopting the February 7, 2020 appraisal date.  The Sons did not appeal or file a timely motion for reconsideration of the August 20, 2020 or November 5, 2020 orders.

At the August 20, 2020 hearing, the Sons claimed that their obligation under the PDPM to pay the Daughters "50 percent of the current bank balance of San Onofre [Properties] LLC" meant the bank balance as of the date of the PDPM.  The Daughters argued that it meant the bank balance as of the close of escrow.  The trial court agreed with the Daughters, ruling that the payment should be 50 percent of the bank balance as of the close of escrow.  The trial court subsequently reaffirmed that determination in a June 14, 2021 written order.  The Sons did not appeal or file a timely motion for reconsideration of the August 20, 2020 or June 14, 2021 orders regarding the San Onofre Properties LLC bank balance.

### QPRTS

To effect separation of the parties' interests in the QPRTS, the Parents filed a petition to modify the QPRTS to buy back the Sons' interests in the QPRTS.  The Sons objected to the petition because they wanted to structure an Internal Revenue Code section 1031[5] exchange (1031 exchange) with respect to their 50 percent interest in the Residence.  The Parents and Daughters objected to a proposed 1031 exchange because it would cause a

---

[5]     Title 26, United States Code section 1031.

15

property tax reassessment of the Residence and an increase in property taxes that would make it financially unfeasible for the Parents to continue living there for the remainder of their lives.

Because the parties could not agree on the terms of a long-form settlement agreement, the Parents filed a motion to enforce the PDPM under Code of Civil Procedure section 664.6, in which the Daughters joined. The Sons objected to the motion. The parties then attended two separate settlement conferences in an effort to resolve the tax issues but were unable to reach an agreement.

On February 11, 2021, the trial court granted the Parents' motion to enforce the PDPM (2/11/21 Ruling). The trial court overruled the Sons' objections and found that a 1031 exchange was not reasonably practical. The court explained that "taking note of the long difficult history of the litigation, of which the undersigned has been involved the last few years to try to bring to an end, it is apparent that a 1031 exchange would require very substantial cooperation and complex legal work requiring numerous intermediate steps, that hinge on cooperation between family members that in turn depends upon a level of trust among family members that unfortunately is not now present." The Sons did not challenge the 2/11/21 Ruling.

On March 22, 2021, the trial court granted the Parents' petition to modify the QPRTS (the March 2021 Order). The Sons did not appeal the March 2021 Order. The Sons nevertheless persisted in their effort to pursue a 1031 exchange by filing their own motion to enforce the PDPM (Amended Motion). The Daughters also filed a separate motion to enforce the PDPM, challenging certain transfers the Sons had made from the San Onofre Properties LLC bank account.

16

In a June 14, 2021 ruling, the trial court denied the Sons' Amended Motion and granted the Daughters' motion. The court treated the Sons' motion as an untimely motion for reconsideration. The court noted it had previously determined that a 1031 exchange was not feasible and would result in an increase in the tax basis for the Residence. The trial court granted the Daughters' motion and found that certain bank transfers by the Sons were in violation of the PDPM. The trial court interpreted the term "current bank balance of San Onofre [Properties] LLC" as used in the PDPM to mean the balance as of the close of escrow. The court issued a written order on June 28, 2021, confirming its June 14, 2021 ruling. The Sons did not appeal or file a timely motion to reconsider the June 2021 orders.

### *Film Library*

The parties were also unable to agree on disposition of the Film Library. On April 30, 2021, the trial court issued an "Order to Show Cause Re: Why the Court Should Not Appoint a Referee to Sell the Film Library," proposing a sale of the Film Library by a court-appointed referee. After considering briefing and argument from the parties, the court continued the OSC to July 29, 2021, for further briefing. Based on the parties' initial and supplemental responses to the OSC, the trial court determined that neither the Sons nor the Daughters were willing to sell their interests in the Film Library to the other. The Sons wished to maintain joint ownership of the Film Library if managed by an independent third party. The Daughters were opposed to joint ownership with the Sons and were willing to sell the Film Library to a third party to separate their interests from the Sons and to prevent future litigation concerning the Film Library. The Sons opposed a sale to a third party.

In a July 29, 2021 ruling, the trial court concluded that neither Code of Civil Procedure section 664.6 nor the terms of the PDPM authorized a court order compelling the sale of the Film Library. The trial court determined, however, that the terms of the PDPM giving it "discretion to assist the Parties in reaching the final terms, as necessary" might "support the Court facilitating the sale of the [Film] Library through Successor Trustee Goldman Sachs in order to avoid further waste of trust assets and effectuate the parties' intent to end litigation and separate their interests." The trial court noted that Goldman Sachs "may be under an obligation to step in given the waste of trust assets and clear desire to end litigation which is being upheld by the retention of this trust asset." The court then issued an "Order to Show Cause Re: Why Goldman Sachs should not be instructed to conduct a sale of the Film Library."

Goldman Sachs in its response argued that the orders appointing it as successor trustee of the Pacific Trust and the La Mesa Pictures LLC operating agreement relieved it from any responsibility to manage or sell the Film Library. The Sons agreed with Goldman Sachs and asked the court to discharge the OSC.

The Daughters responded by filing a petition for an order appointing a special purpose trustee for the purpose of selling the Film Library. The Daughters argued that the trial court had the authority to do so under Probate Code section 17206. The Sons objected to the petition.

### *Motions to enter judgment and petition to appoint special purpose trustee*

On September 3, 2021, the Parents filed in each of the pending cases identical motions to enter judgment on the PDPM,

18

accompanied by proposed terms of judgment. The Daughters joined in the Parents' motions. The Sons opposed them.

After considering briefing and argument by the parties, the trial court issued a final ruling on October 27, 2021 granting the motions to enter judgment and the petition to appoint a special purpose trustee of the Pacific Trust. In its ruling, the trial court identified five areas of dispute: (1) the applicable appraised value dates and date for determining bank account balances; (2) appointment of a special purpose trustee to manage La Mesa Pictures LLC; (3) distribution of the Tessa Trust film rights; (4) the Black Scorpion loan; and (5) the scope of releases.

The trial court ruled that the Sons' claims regarding the real property appraisal dates and the date for determining the "current" bank balance of San Onofre Properties LLC had been previously adjudicated at the August 20, 2020 hearing and in a final order the Sons failed to timely challenge. The trial court deemed the Sons' claims to be an untimely motion for reconsideration under Code of Civil Procedure section 1008, which the court denied.

The trial court deemed the Sons' proposal to divide the Tessa Trust film rights equally between the Sons and Daughters to be premature, given the PDPM's terms that 50 percent of the of Tessa Trust assets be distributed to the Sons "in kind or in cash, to be determined in Phase 2."

The trial court rejected the Sons' claims that the Black Scorpion loan should be declared immediately due and payable. The trial court noted that under the 2006 loan modification agreement, payments under the Black Scorpion loan are not due until after the death of both Parents. The court further noted that the Sons "do not offer any argument showing the Parents

19

are immediately responsible for payments, only arguing this would further the separation of interests."

The trial court also rejected the Sons' attempt to narrow the scope of the releases in the Parents' proposed judgment, finding the Sons' proposed limitations to be "facially inconsistent with the PDPM."

The trial court overruled the Sons' objections to the Daughters' petition to appoint a special purpose trustee of the Pacific Trust and granted the petition. The trial court found there was a vacancy in the position of trustee of the Pacific Trust with respect to La Mesa Pictures LLC, given Goldman Sachs's inability to administer the Film Library; that the Daughters had standing to petition for appointment of a special purpose trustee; and that the court had inherent authority to carry out its express powers to supervise administration of the trust, including appointing a special purpose trustee.

The court rejected the Sons' argument that the La Mesa Pictures LLC operating agreement precludes the special purpose trustee from selling the LLC. The trial court noted that the operating agreement provision prohibiting sale of any interest in the LLC applied only to LLC members, and the special purpose trustee is not a member as defined in the La Mesa Pictures LLC operating agreement. The court explained however, that it was "not at this time passing on whether a sale of the Film Library is reasonable or necessary. The Court is merely appointing a Special Trustee to fill the vacancy in management of assets of La Mesa [Pictures] LLC and to determine whether a sale of the LLC is desirable. To the extent the Special Trustee believes a sale of the [Film] Library is desirable, the next step would be for the

20

Special Trustee to file a Petition for Instructions, which the parties would have an opportunity to address."

On November 5, 2021, the Sons filed a motion for reconsideration of the trial court's final ruling. The Parents and the Daughters opposed the motion. On December 6, 2021, the trial court granted the Sons' motion in part, amending that portion of the court's October 27, 2021 ruling stating that modification of the Pacific Trust subtrusts was to be effective as of the close of escrow. The court amended its ruling to state that the February 5, 2021 orders modifying the Pacific Trust subtrusts were effective as of the date of the orders. The trial court issued an amended final ruling on December 7, 2021, reflecting this change.

The Sons appealed the trial court's October 27, 2021 and December 7, 2021 rulings[6] in each of the three cases and filed a motion to consolidate the appeals. We granted the motion to consolidate.

**CONTENTIONS ON APPEAL**

The Sons raise the following contentions on appeal:

I. The trial court exceeded the scope of its authority by granting the Daughters' petition to appoint a special purpose trustee of the Pacific Trust, with authority to administer and sell La Mesa Pictures LLC.

II. The trial court erred in using February 7, 2020, as the appraisal date for the real property assets and in using the close

---

[6] The October 27, 2021 final ruling and the December 7, 2021 amended final ruling are identical in all material respects except that the December 7, 2021 amended final ruling grants the Sons' motion for reconsideration.

21

of escrow as the date for determining San Onofre Properties LLC's bank balance.

III.  The Black Scorpion loan should be paid in full at the close of escrow.

IV.  The trial court exceeded its authority by expanding the scope and duration of the PDPM release terms.

V.  The trial court erred in rejecting the Sons' request for a 1031 exchange in connection with the QPRTS modifications.

VI.  The parties should be directed to negotiate a long-form agreement.

## APPEALABILITY

As a preliminary matter, we discuss whether the Sons raise any appealable issues.  "A reviewing court has jurisdiction over a direct appeal only when there is (1) an appealable order or (2) an appealable judgment."  (*Griset v. Fair Political Practices Com.* (2001) 25 Cal.4th 688, 696.)  Regardless of whether an appealability challenge is raised, "[t]he existence of an appealable judgment is a jurisdictional prerequisite to an appeal.  A reviewing court must raise the issue on its own initiative whenever a doubt exists as to whether the trial court has entered a final judgment or other order or judgment made appealable by Code of Civil Procedure section 904.1."  (*Jennings v. Marralle* (1994) 8 Cal.4th 121, 126.)

The Sons challenge multiple orders contained in the December 7, 2021 amended final ruling[7] that is the subject of this

---

[7]      The Sons appealed both the October 27, 2021 final ruling and the December 7, 2021 amended final ruling.  As previously discussed, the October 27, 2021 final ruling and the December 7, 2021 amended ruling are identical in all material respects except

22

appeal. The December 7, 2021 amended final ruling was issued in three separate but related cases— one civil and two probate cases. Some of the challenged orders were issued under the Probate Code and some were issued pursuant to Code of Civil Procedure section 664.6. Different statutory schemes govern the appealability of the challenged orders, depending on whether they were issued under the Probate Code or pursuant to Code of Civil Procedure section 664.6. Probate Code sections 1300 through 1304 specify the orders that are appealable in probate cases. Code of Civil Procedure section 904.1 lists appealable orders and judgments in civil cases.

Code of Civil Procedure section 904.1, subdivision (a)(10) provides that an appeal may be taken "[f]rom an order made appealable by the Probate Code." "It is well established that '[a]ppeals which may be taken from orders in probate proceedings are set forth in . . . the Probate Code, and its provisions are exclusive.' [Citation.] 'There is no right to appeal from any orders in probate except those specified in the Probate Code.'" (*Estate of Stoddart* (2004) 115 Cal.App.4th 1118, 1125–1126 (*Stoddart*).)

"[U]nlike civil appeals, which generally are governed by the 'one final judgment' rule [citation], appeals can properly be taken under the Probate Code from a variety of orders issued at different junctures during the administration of a probate estate. [Citations.] Thus, a probate order may be appealable as a final order even if it did not fully dispose of every issue raised in a

the December 7, 2021 ruling grants the Sons' December 6, 2021 motion for reconsideration regarding the effective date of the orders modifying the Pacific Trust subtrusts are effective as of the date of those orders.

23

petition under Probate Code section 17200." (*Godoy v. Linzner* (2024) 106 Cal.App.5th 765, 773–774 (*Godoy*).)

Code of Civil Procedure section 904.1 specifies the appealable orders and judgments in civil cases. Subdivision (a)(1) of that statute provides that an appeal may be taken"[f]rom a judgment, except an interlocutory judgment." (Code Civ. Proc., § 904.1, subd. (a)(1).)[8] Code of Civil Procedure section 904.1, subdivision (a)(1) codifies the "one final judgment rule" which allows an appeal to be taken only from a final judgment. (See *In re Baycol Cases I & II* (2011) 51 Cal.4th 751, 754.)

**Appealability of order appointing special purpose trustee**

The Sons challenge the order appointing the special purpose trustee of the Pacific Trust to administer the Film Library. The trial court issued that order pursuant to Probate Code section 17206. The order appointing the special purpose trustee is appealable under Probate Code section 1304, subdivision (a).[9] That statute states: "With respect to a trust,

---

[8] Code of Civil Procedure section 904.1, subdivision (a)(1) allows the appeal of certain specified interlocutory judgments, e.g., those listed in subdivision (a)(8), (9), and (11). The interlocutory judgments listed in those subdivisions are not at issue in this appeal.

[9] The Sons cite Probate Code section 1300, subdivisions (a), (c), and (g) as authorizing their appeal; however, those statutory provisions do not apply. Subdivision (a) of section 1300 authorizes an appeal from an order "[d]irecting, authorizing, approving, or confirming the sale, lease, encumbrance, grant of an option, purchase, conveyance, or exchange of property." Subdivision (c) of section 1300 allows an appeal from an order "[a]uthorizing, instructing, or directing a fiduciary, or approving or confirming the acts of a fiduciary." For those provisions to be applicable, the order instructing or authorizing the fiduciary

24

the grant or denial of the following orders is appealable:  [¶] (a) Any final order under Chapter 3 (commencing with Section 17200) of Part 5 of Division 9, except the following:  [¶]  (1) Compelling the trustee or trust director to submit an account or report acts as trustee or trust director, respectively.  [¶]  (2) Accepting the resignation of the trustee or trust director." Probate Code section 17206 is under chapter 3 of part 5 of division 9 of the Probate Code.  The order appointing the special purpose trustee, made under Probate Code section 17206, is appealable.

**Appealability of order re: real estate appraisal dates and San Onofre Properties LLC bank balance**

The Sons fail to establish appellate jurisdiction to review the trial court's denial of their requests to update the real property appraisals and to fix the date for determining the San Onofre Properties LLC bank balance as February 7, 2020, rather than the close of escrow.  In the December 7, 2021 amended final ruling, the trial court denied the Sons' requests as an untimely motion for reconsideration of prior final orders made on

---

must be directed at someone who is already a fiduciary; they do not encompass appointment of a fiduciary such as the special purpose trustee.  (*Young v. Hartford* (2024) 106 Cal.App.5th 730, 738.)

Probate Code section 1300, subdivision (g) similarly does not authorize the Sons' appeal.  Subdivision (g) of section 1300 allows an appeal from an order "[s]urcharging, removing, or discharging a fiduciary."  The December 7, 2021 amended final ruling does not discharge Goldman Sachs as a fiduciary.  Rather, it discharges the trial court's previously issued order to show cause as to why Goldman Sachs should not be ordered to sell the Film Library.

25

August 20, 2020.  The trial court had previously reaffirmed the August 20, 2020 orders in written orders issued on November 5, 2020, June 14, 2021, and June 28, 2021.  We do not have jurisdiction to review the August 20, 2020 orders or any of the subsequent orders reaffirming those orders because they were all final orders made under the Probate Code, and the Sons never appealed any of them.  (See *Godoy, supra*, 106 Cal.App.5th at pp. 773–774.)

We also lack jurisdiction to review the trial court's basis for denying the Sons' requests.  The trial court deemed the Sons' requests to update the appraisals and to change the date for determining the San Onofre Properties LLC bank balance to be an untimely motion for reconsideration of previous orders made under the Probate Code.  As discussed, Code of Civil Procedure section 904.1, subdivision (a)(10) provides that an appeal may be taken "[f]rom an order made appealable by the Probate Code." An order denying a motion for reconsideration is not among the orders made appealable by the Probate Code.  (See Prob. Code, §§ 1303, 1304; *Stoddart, supra*, 115 Cal.App.4th at p. 1126.)

**Appealability of release provisions**

In its December 7, 2021 amended final ruling, the trial court granted the Parents' Code of Civil Procedure section 664.6 motions to enter judgment, including proposed terms of judgment that contained release provisions.  The trial court did not, however, subsequently enter judgment.  (Code Civ. Proc. § 664.6, subd. (a) ["the court, upon motion, may enter judgment pursuant to the terms of the settlement"].)  Whether there is appellate jurisdiction to review the Sons' challenge to the release provisions turns on whether the December 7, 2021 amended final ruling is a

26

final judgment.  Only a final judgment is appealable.  (Code Civ. Proc., § 904.1, subd. (a)(1).)

The absence of a separately filed document entitled "judgment" does not prevent an order under Code of Civil Procedure section 664.6 from having the effect of a judgment for purposes of appeal.  (*Hines v. Lukes* (2008) 167 Cal.App.4th 1174, 1183.)  An order granting a motion to enter judgment is an appealable order if it finally determines the rights of the parties and requires no further judicial action except to enforce what had been determined.  (*Ibid.*)  "Absent a formal entry of judgment, an appellate court may amend an order to include a judgment if the effect of the order is to finally determine the rights of the parties in the action."  (*Ibid.*)  We conclude that the effect of the trial court's December 7, 2021 amended final ruling was to finally determine the rights of the parties regarding settlement.  We therefore amend that order to include a judgment that incorporates the Parents' proposed terms of judgment.

**Appealability of order denying Sons' request for a 1031 exchange**

The Sons concede their challenge to the trial court's March 22, 2021 order denying their request for a 1031 exchange with respect to the QPRTS modifications is not appealable.

## DISCUSSION

We discuss below the merits of the Sons' contentions regarding the appealable issues.

### I.    Applicable law and standard of review

Code of Civil Procedure section 664.6 provides a summary procedure to enforce a settlement by entering judgment pursuant to the terms of the settlement.  (*Weddington Productions, Inc. v.*

27

*Flick* (1998) 60 Cal.App.4th 793, 809 (*Weddington*).) The statute states that if the parties to pending litigation enter into a settlement either in a writing signed by the parties or orally before the court, the court may enter judgment pursuant to the terms of the settlement. (Code Civ. Proc., § 664.6.)[10]

When ruling on a motion under Code of Civil Procedure section 664.6, a court acts as a trier of fact. (*Fiore v. Alvord* (1985) 182 Cal.App.3d 561, 565.) The court must determine whether the parties entered into a valid and binding settlement agreement. (*Osumi v. Sutton* (2007) 151 Cal.App.4th 1355, 1360; see *In re Marriage of Assemi* (1994) 7 Cal.4th 896, 905.)

"'A settlement agreement is a contract, and the legal principles which apply to contracts generally apply to settlement contracts. [Citation.] An essential element of any contract is "consent." [Citations.] The "consent" must be "mutual." [Citations.] . . .' [Citations.] "'The existence of mutual consent is determined by objective rather than subjective criteria, the test being what the outward manifestations of consent would lead a reasonable person to believe. [Citation.] Accordingly, the primary focus in determining the existence of mutual consent is

---

[10]     Code of Civil Procedure section 664.6 subdivision (a) provides: "If parties to pending litigation stipulate, in a writing signed by the parties outside of the presence of the court or orally before the court, for settlement of the case, or part thereof, the court, upon motion, may enter judgment pursuant to the terms of the settlement. If the parties to the settlement agreement or their counsel stipulate in writing or orally before the court, the court may dismiss the case as to the settling parties without prejudice and retain jurisdiction over the parties to enforce the settlement until performance in full of the terms of the settlement."

28

upon the acts of the parties involved.""" (*Monster Energy Co. v. Schechter* (2019) 7 Cal.5th 781, 789.)  When making this determination, the trial court may consider the parties' declarations and other evidence in deciding what terms the parties agreed upon.  The trial court's factual findings in this regard are reviewed under the substantial evidence standard.  (*In re Marriage of Assemi, supra*, 7 Cal.4th at p. 911.)

## II.     Appointment of special purpose trustee

The Sons contend the trial court's appointment of a special purpose trustee of the Pacific Trust to administer La Mesa Pictures LLC and the Film Library was unauthorized for the following reasons:  The owner of the Film Library, La Mesa Pictures LLC, is not an asset of the Pacific Trust; neither Goldman Sachs nor any other trustee has authority to sell La Mesa Pictures LLC or any of its assets; and the parties never entered into an enforceable agreement to sell La Mesa Pictures LLC or its assets.  None of these reasons supports reversal of the appointment order.

### A.     *La Mesa Pictures LLC is an asset of the Pacific Trust*

The record contradicts the Sons' assertion that La Mesa Pictures LLC is not an asset of the Pacific Trust.  The PDPM signed by the Sons states that the Film Library is "held within the Pacific Trust."

The 2014 order appointing Goldman Sachs as trustee of the Pacific Trust and directing the creation of the LLC's to hold the trust assets expressly states that both LLC's (La Mesa Pictures LLC and San Onofre Properties LLC) would be wholly owned by the Pacific Trust:  "Two (2) separate limited liability companies ('LLCs') are to be created by Goldman Sachs as Trustee, each of

29

which will be wholly-owned by the [Pacific] Trust.  The Trustee will transfer the Trust's IP rights [the Film Library] into one such LLC and the Trust's Real Property into the second such LLC."

## B. *Appointment of the special purpose trustee was within the trial court's authority*

The Sons do not dispute that Goldman Sachs is not authorized to manage or sell the Film Library.  Goldman Sachs's inability to do so supports the trial court's finding that a vacancy exists in the position of the trustee of the Pacific Trust with respect to La Mesa Pictures LLC and the Film Library.

The trial court was authorized to appoint a special purpose trustee to fill that vacancy.  Probate Code section 17206 confers such authority:  "The court in its discretion may make any orders and take any other action necessary or proper to dispose of the matters presented by the petition, including appointment of a temporary trustee to administer the trust in whole or in part." That statutory authority includes broad discretion to authorize trustee actions in advance.  (*People ex rel. Harris & Becerra v. Shine* (2017) 16 Cal.App.5th 524, 539.)

Appointment of the special purpose trustee was also within the trial court's "'*inherent power* to decide all incidental issues necessary to carry out its express powers to supervise the administration of the trust.'"  (*Schwartz v. Labow* (2008) 164 Cal.App.4th 417, 427.)  That inherent power includes appointing an interim or special purpose trustee.  (*Ibid.*)

30

C. ***The La Mesa Pictures LLC operating agreement does not preclude a sale by the special purpose trustee***

The Sons claim that the La Mesa Pictures LLC operating agreement governs any sale of the Film Library and that sections 2.10A. and 3.3B.(i) of the operating agreement require a majority vote of the Sons and Daughters to authorize such a sale. Those two sections, read together, require a majority vote of the subtrust beneficiaries (i.e., the Sons and Daughters) for "[t]he sale, exchange or other disposition of all, or substantially all, of [La Mesa Pictures LLC's] assets occurring as part of a single transaction or plan or a series of transactions."[11]

Sections 2.10A. and 3.3B.(i) of the La Mesa Pictures LLC operating agreement do not, however, preclude the Pacific Trust itself from selling La Mesa Pictures LLC. As the trial court found, "[T]he Operating Agreement plainly does not control a potential sale of La Mesa [Pictures] LLC itself, the LLC being an

---

[11] Section 2.10A. of the La Mesa Pictures LLC operating agreement gives the Sons and Daughters, as beneficiaries of the subtrusts for which Goldman Sachs serves as trustee, certain rights: "[I]f any Member is a trustee holding a membership interest in the Company pursuant to a fiduciary trust relationship (a 'Trustee-Member') [(in this case, Goldman Sachs)], then the Beneficiary or Beneficiaries of that trust who are not Incompetent or Incapacitated will hold the rights and powers described in Paragraphs 3.1C, 3.3B, 3.4A, 3.5, 3.6, 3.7, and 7.1B of this Agreement."

Section 3.3B.(i) restricts the authority of the La Mesa Pictures LLC manager to engage in extraordinary transactions requiring a vote of the members, including the sale, exchange, or disposition of all or substantially all of the LLC's assets.

31

asset of the Pacific Trust." The Daughters' petition requested appointment of a special purpose trustee of the Pacific Trust with authority to administer trust assets, including sale of La Mesa Pictures LLC to a third party. The trial court noted that La Mesa Pictures LLC is an asset of the Pacific Trust and may be sold without breaching the La Mesa Pictures LLC operating agreement: "There is nothing indicating the Operating Agreement was intended to restrain the trustee's ability to manage assets of the Trust." The Sons fail to establish otherwise.

### D. *No agreement to sell*

The Sons contend they never agreed to sell La Mesa Pictures LLC or its assets, and the language of the PDPM does not support such a sale. The order appointing the special purpose trustee, however, does not compel the sale of La Mesa Pictures LLC or the Film Library. The trial court's amended final ruling states: "[T]he Court is not at this time passing on whether a sale of the Film Library is reasonable or necessary. The Court is merely appointing a Special Trustee to fill the vacancy in management of assets of La Mesa [Pictures] LLC and to determine whether a sale of the LLC is desirable. To the extent the Special Trustee believes a sale of the Library is desirable, the next step would be for the Special Trustee to file a Petition for Instructions, which the parties would have an opportunity to address."

The trial court's ruling is consistent with the terms of the PDPM that state: "The disposition of the Film Library LLC rights shall be dealt with in Phase 2."

## III. Dates for real estate appraisals and bank balances

For reasons discussed previously, the trial court's denial of the Sons' requests to reconsider its previous orders regarding the

appraisal dates for the Residence, San Vicente Property, and 2nd Street Property and the date for determining the San Onofre Properties LLC bank account balance are not appealable. We therefore do not consider the Sons' arguments on these issues.

## IV. Black Scorpion loan

Collateral estoppel bars the Sons' claim that the Black Scorpion loan should be paid in full before Julie's death. "'Collateral estoppel precludes relitigation of issues argued and decided in prior proceedings.'" (*Hernandez v. City of Pomona* (2009) 46 Cal.4th 501, 511.) The threshold requirements for its application are (1) the issue is identical to that decided in a former proceeding; (2) the issue was actually litigated in the former proceeding; (3) the issue was necessarily decided in the former proceeding; (4) the decision in the former proceeding was final and on the merits; and (5) the party against whom preclusion is sought is the same as, or in privity with, the party to the former proceeding. (*Ibid.*) "'The "identical issue" requirement addresses whether "identical factual allegations" are at stake in the two proceedings, not whether the ultimate issues or dispositions are the same.'" (*Id.* at pp. 511–512.) When the facts determining whether the trial court properly applied collateral estoppel are uncontested, application of the doctrine is a question of law subject to de novo review. (*Roos v. Red* (2005) 130 Cal.App.4th 870, 878.)

The issue the Sons raise in this appeal is identical to that asserted in the 2009–2013 litigation. In the 2009–2013 litigation, the Sons claimed the Parents had defaulted under the Black Scorpion loan by selling New Horizons preferred stock in 2005. The Sons argue here, as they did in the 2009–2013 litigation, that the Black Scorpion loan is immediately due and payable because

33

collateral securing the loan "was disposed of." It is undisputed that the collateral securing the Black Scorpion loan consists of New Horizons preferred stock. The Sons claim in this appeal that a purported sale of New Horizons' film library in 2018 triggered a default, making the loan immediately due and payable.

In the 2013 judgment, Judge Goetz rejected the Sons' argument that the Parents' 2005 sale of New Horizons stock triggered a default that accelerated the loan's due date.[12] The 2013 judgment made clear that the 2006 loan modification agreement extended the due date for principal and interest under the Black Scorpion loan to the date of the survivor of the Parents. The Sons never challenged on appeal the 2013 judgment's adjudication regarding the Black Scorpion loan. That adjudication is binding here. (*Hernandez v. City of Pomona, supra*, 46 Cal.4th at p. 511.)

The Sons' claim regarding the Black Scorpion loan is without merit for the additional reason that it is inconsistent with the express terms of the PDPM. The PDPM states in relevant part: "Nothing herein is meant to change or supersede the . . . obligations relating to the Black Scorpion loan, which shall be dealt with in Phase 2."

---

[12] The Sons acknowledge there was evidence in the 2009–2013 litigation that sale of the New Horizons preferred shares in 2005 did not impair the first priority lien and security interest on those shares. They presented no evidence in the 2009–2013 litigation or in the current litigation demonstrating impairment of the security interest.

## V. Scope of release

The trial court acted within its authority under Code of Civil Procedure section 664.6 and the PDPM in interpreting the release provisions of the PDPM.

### A. *Applicable law and standard of review*

When enforcing a settlement agreement, a trial court has authority to interpret its terms. (*Skulnick v. Roberts Express, Inc.* (1992) 2 Cal.App.4th 884, 889.) "A settlement agreement is a contract, and the legal principles which apply to contracts generally apply to settlement contracts." (*Weddington, supra*, 60 Cal.App.4th at p. 810.) ""'Under statutory rules of contract interpretation, the mutual intention of the parties at the time the contract is formed governs interpretation. (Civ. Code, § 1636.) Such intent is to be inferred, if possible, solely from the written provisions of the contract. (*Id.*, § 1639.)'"" (*Canaan Taiwanese Christian Church v. All World Mission Ministries* (2012) 211 Cal.App.4th 1115, 1124 (*Canaan*).)

"The whole of a contract is to be taken together, so as to give effect to every part, if reasonably practicable, each clause helping to interpret the other." (Civ. Code, § 1641.) "'The factual context in which an agreement was reached is also relevant to establish its meaning unless the words themselves are susceptible to only one interpretation.'" (*Canaan, supra*, 211 Cal.App.4th at p. 1124.; see Civ. Code, § 1647 ["A contract may be explained by reference to the circumstances under which it was made, and the matter to which it relates."]; *Nish Noroian Farms v. Agricultural Labor Relations Bd*. (1984) 35 Cal.3d 726, 735.)

Absent a factual dispute arising from the credibility of extrinsic evidence, an appellate court independently determines a

35

settlement contract's terms in accordance with the applicable legal principles.  (*Canaan, supra*, 211 Cal.App.4th at p. 1124.)

**B.    *The trial court acted within its authority***

The PDPM release provisions state: "The long form agreement shall include mutual and general releases for all claims including without limitation with respect to elder abuse, breaches of fiduciary duty of all kinds, financial abuses, accountings or transactions for any entity/trust prior to the date of settlement for all parties in all capacities.  Releases from Pacific Trust and beneficiaries of all irrevocable trusts, New Horizons, Roger & Julie, individually and in all other capacities, as well as all of Roger's and Julie's other entities as well as entities of Roger M., Brian, Catherine and/or Mary.  These releases shall apply to any claims that Roger M. or Brian have against Catherine or Mary concerning any gifts or transfer of assets by Roger W. and Julie, in the past.  Any releases that extend to other family members, who are not parties to this agreement, shall be dealt with in Phase 2.  This release shall not apply to issues of estate, gift, and income taxes, which shall be dealt with in Phase 2."

"Other standard boiler plate provisions, including Civil Code § 1542 and cooperation clauses."

We interpret the PDPM release provisions, as did the trial court, to include "entities owned in whole or in part or controlled by the Parents," and the parties' "attorneys, accountants, business managers, representatives, agents, employees, officers, direct[or]s, partners, affiliates, affiliated entities, heirs, assigns, and successors-in-interests."  Including such persons and entities is consistent with the parties' intent expressly stated elsewhere in the PDPM "to put a final end to all litigation between and

36

among the family members and related entities." That interpretation is also consistent with the PDPM's provisions stating that "[t]he parties are entering into this agreement and each of its terms in all of their capacities" and that the agreement "is binding upon and shall inure to the benefit of the Parties, their heirs, successors, and assigns."

Interpreting the release to include the specified persons and entities is also consistent with the parties' express intent to include "[o]ther standard boiler plate provisions," including a waiver of rights under Civil Code section 1542, which waives unknown claims. (*Winet v. Price* (1992) 4 Cal.App.4th 1159, 1170–1171.) Including entities and persons such as attorneys, accountants, agents, employees, affiliates, etc. "whose potential liability may derive from or depend on that" of the parties "is typical of many releases." (*Fassberg Construction Co. v. Housing Authority of City of Los Angeles* (2007) 152 Cal.App.4th 720, 767; see also *Ignacio v. Caracciolo* (2016) 2 Cal.App.5th 81, 88.) As the trial court recognized, "[w]ithout such a release the parties would be free to pursue litigation against affiliated persons and entities despite the intent to reach a global settlement, thereby frustrating the purpose of releasing claims in the first place." The Sons' unexpressed subjective intent to retain the right to sue such persons and entities at the time they signed the PDPM is an insufficient basis for adopting their narrower interpretation of the release language. (*Winet, supra*, at p. 1167.)

The trial court did not materially rewrite the PDPM by interpreting the releases to encompass claims through the date of entry of judgment. The PDPM release provisions do not specify when the releases are to be effective. The PDPM release language, however, uses the future tense—"shall include mutual

37

and general releases for all claims" and "releases shall apply to any claims" and "releases that extend to other family members, who are not parties to this agreement, shall be dealt with in Phase 2."  The language of the PDPM contemplates a future effective date.  (See *People v. Loeun* (1997) 17 Cal.4th 1, 11 ["'[The legislative] use of a verb tense is significant in construing statutes.'"], superseded by statute on another ground as stated in *People v. Clark* (2024) 15 Cal.5th 743, 755, fn. 2; see also *Christian v. Flora* (2008) 164 Cal.App.4th 539, 551 ["Contracts . . . are writings to be construed in accordance with substantially the same canons of interpretation as statutes."].)

The trial court's interpretation is consistent with the parties' intent to achieve a global resolution and end all litigation.  Interpreting the releases to encompass claims through the date of entry of judgment does not, as the Sons claim, foreclose claims arising out of misconduct by the Parents, Daughters, or their related entities.  The PDPM provides a mechanism for resolving such claims by way of a "true-up for the period from the date of settlement through the date of closing" that encompasses cash and cash equivalents in all trusts and entities in which the parties have shared or overlapping interests to address any such claims.

Finally, the trial court's interpretation is authorized not only by Code of Civil Procedure section 664.6 and applicable principles of contract interpretation, but by the PDPM itself.  The parties expressly agreed that Judge Cowan would "participate as a settlement officer in the negotiation of the final long-form agreement, and he shall have discretion to assist the Parties in reaching the final terms, as necessary."

38

The Sons establish no error in the trial court's interpretation of the PDPM release terms.

## VI. Sons' tax proposal

The Sons concede that their challenge to the trial court's March 22, 2021 order denying their request for a 1031 exchange with respect to the QPRTS modifications is not cognizable on appeal. We accordingly do not address this claim.

## VII. Long-form agreement

The judgment entered on the PDPM moots the Sons' argument that the parties should be ordered to negotiate a long-form agreement.

## DISPOSITION

The December 7, 2021 amended final ruling granting the motions to enter judgment in Los Angeles Superior Court case Nos. BC681310, SP007923, and 17STPB07675, as amended to constitute a final appealable judgment, is affirmed. Respondents shall recover their costs on appeal.

CHAVEZ, Acting P. J.

We concur:

RICHARDSON, J.                    GOORVITCH, J.*

---

\*      Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.